**HUMANITARIAN LAW PROJECT,
et al., Plaintiffs,**

v.

**Janet RENO, as Attorney General of the
United States, et al., Defendants.**

**No. CV 98–1971 ABC(BQRX).**

United States District Court,
C.D. California.

June 8, 1998.

David Cole, Georgetown University Law Center, Washington, DC, Nancy Chang, Center for Constitutional Rights, New York, NY, Paul Hoffman, Carol Sobel, Center for Constitutional Rights, Santa Monica, CA, Visuva-nathan Rudrakumaran, New York, NY, for Plaintiff/Petitioner/Appellant.

Frank W. Munger, Assistant Attorney General, David J. Anderson, John R. Tyler, Martha E. Rubio, Department of Justice, Civil Division, Los Angeles, CA, for Defendant/Respondent/Appellee.

## ORDER RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

COLLINS, District Judge.

The Motion for Preliminary Injunction of Plaintiffs HUMANITARIAN LAW PROJECT, RALPH FERTIG, ILANKAI THAMIL SANGAM, TAMILS OF NORTHERN CALIFORNIA, TAMIL WELFARE AND HUMAN RIGHTS COMMITTEE, FEDERATION OF TAMIL SANGAMS OF NORTH AMERICA, WORLD TAMIL COORDINATING COMMITTEE, and NAGALINGAM JEYALINGAM came on regularly for hearing before this Court on June 8, 1998. After reviewing the materials submitted by the parties, argument of counsel, and the case file, the Court GRANTS in part, and DENIES in part, Plaintiffs' motion.

### I. Factual Background

This action involves a challenge to the constitutionality of § 302 and § 303 of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 8 U.S.C. § 1189 and 18 U.S.C. § 2339B, respectively.

*The Regulatory Scheme*

President Clinton signed the AEDPA into law on April 24, 1996. Section 302 of the AEDPA permits the Secretary of State (the "Secretary"), in consultation with the Secretary of the Treasury and the Attorney General, "to designate an organization as a foreign terrorist organization ... if the Secretary finds that (A) the organization is a foreign organization; (B) the organization engages in terrorist activity ...; and (C) the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1). The AEDPA defines "terrorist activity" as "an act which the actor knows, or reasonably

should know, affords material support to any individual, organization, or government in conducting a terrorist activity at any time." 8 U.S.C. § 1182(a)(3)(B)(iii). "National security" is defined as "the national defense, foreign relations, or economic interests of the United States." 8 U.S.C. § 1189(c)(2).

Prior to designating an organization as a foreign terrorist organization, the Secretary must notify specified members of Congress. *See* 8 U.S.C. § 1189(a)(2)(A). Seven days thereafter, the Secretary must publish the designation in the Federal Register. *See id.* The designation is effective upon publication. *See id.* § 1189(a)(2)(B).

A group designated as a foreign terrorist organization may seek judicial review of the Secretary's designation by filing an action in the United States Court of Appeals for the District of Columbia within 30 days of the published designation. 8 U.S.C. § 1189(b)(1). Any review "shall be based solely upon the administrative record, except that the Government may submit, for ex parte and in camera review, classified information used in making the designation." *Id.* § 1189(b)(2). Section 1189 sets forth certain circumstances wherein the Court of Appeals may set aside the Secretary's designation. *See id.* § 1189(b)(3). In addition to the Court of Appeals setting aside a designation, a group may cease to be designated as a foreign terrorist organization if: (1) the Secretary fails to renew the designation after two years, *see id.* § 1189(a)(4)(B); (2) Congress blocks or revokes a designation, *see id.* § 1189(a)(5); or (3) the Secretary revokes the designation based on a finding that changed circumstances or national security warrants such a revocation. *See id.* § 1189(a)(6)(A).

Section 303 of the AEDPA provides: "Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both." 18 U.S.C. § 2339B(a). The AEDPA defines the term "material support or resources" as "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." *Id.* § 2339A(b) (emphases added).

### The Secretary's Designation

On October 8, 1997, the Secretary designated 30 organizations as "foreign terrorist organizations" under the AEDPA. *See* 62 Fed.Reg. 52,649–51. The designated organizations included the Kurdistan Workers' Party, a.k.a. Partiya Karkeran Kurdistan, a.k.a. PKK ("PKK") and the Liberation Tigers of Tamil Eelam, a.k.a. LTTE, a.k.a. Tamil Tigers, a.k.a. Ellalan Force ("LTTE"). On November 6, 1997, the LTTE sought judicial review of the Secretary's designation. To date, the Court of Appeals has not rendered a decision. The PKK did not seek judicial review of the designation.

### The Plaintiffs

Plaintiffs are six organizations and two United States citizens. Plaintiffs seek to provide support to the humanitarian and political activities of the PKK and the LTTE. Since October 8, 1997, the date on which the Secretary designated the PKK and the LTTE as foreign terrorist organizations, Plaintiffs and their members and individuals associated with the organizational Plaintiffs have not provided such support, fearing criminal investigation, prosecution, and conviction.

### The PKK and the Plaintiffs That Support it

The PKK was formed approximately 20 years ago with the goal of achieving self-determination for the Kurds in Southeastern Turkey. It is comprised primarily of Turkish Kurds. The PKK is the leading political organization representing the interests of the Kurds in Turkey. Plaintiffs allege that for more than 70 years, the Turkish government has subjected the Kurds to human rights abuses and discrimination. The PKK's efforts on behalf of the Kurds include political organizing and advocacy and diplomatic activity around the world. It organizes political forums, international conferences, and cultural festivals outside Turkey to bring attention to the plight of the Kurds there. It

publishes and distributes newspapers and pamphlets championing the Kurds' cause and denouncing human right violations. It provides social services and humanitarian aid to Kurds in exile, has established a quasi-governmental structure in areas of Turkey under its control, and defends the Kurds from alleged Turkish human rights abuses.

Two Plaintiffs, Humanitarian Law Project ("HLP") and Administrative Judge Ralph Fertig,[1] HLP's President, seek to support the PKK's peaceful and non-violent activities. The HLP, a not-for-profit organization headquartered in Los Angeles, is dedicated to furthering international compliance with humanitarian law and human rights law and the peaceful resolution of armed conflicts.[2]

The HLP has consultative status to the United Nations ("UN") as a non-governmental organization and regularly participates in meetings of the UN Commission on Human Rights in Geneva, Switzerland. The HLP conducts fact-finding missions, writes and publishes reports, and works for the peaceful resolution of armed conflicts around the world.

Judge Fertig has a career of over 50 years in human rights work. He has been a member of the HLP's Board of Directors since 1989, serving as President from 1993 to 1995 and from 1997 to the present. He has participated in HLP delegations that have investigated alleged human rights violations in Turkey, Mexico, and El Salvador, has written reports for the HLP, and has trained others in the use of international human rights law and other lawful means for the peaceful resolution of disputes.

Since 1991, the HLP and Judge Fertig have devoted substantial time and resources advocating on behalf of the Kurds living in Turkey and working with the PKK. Judge Fertig and other individuals associated with the HLP have conducted fact-finding investigations on the Kurds in Turkey and have published reports and articles presenting their findings, which are supportive of the

PKK and the struggle for Kurdish liberation. They assert that the Turkish government has committed extensive human rights violations against the Kurds, including the summary execution of more than 18,000 Kurds, the widespread use of arbitrary detentions and torture against persons who speak out for equal rights for Kurds or are suspected of sympathizing with those who do, and the wholesale destruction of some 2,400 Kurdish villages. Applying international law principles, they have concluded that the PKK is a party to an armed conflict governed by Geneva Conventions and Protocols and, therefore, is not a terrorist organization under international law.

To further peaceful resolutions of the armed conflict in Turkey and protect the human rights of the Kurds, the HLP, Judge Fertig, and other individuals associated with the HLP have worked with and supported the PKK in numerous ways. They have advocated for the political freedoms and human rights of the Kurds and the PKK before the UN Commission on Human Rights, and have urged the UN to extend to the PKK the protections of the Geneva Conventions and Protocols. They have petitioned members of Congress to support Kurdish human rights and to encourage negotiations between the PKK and the Turkish government. They have argued for the release of Leyla Zana, Hatip Dicle, Orhan Dogan, and Selim Sadak, four Kurds who were elected to the Turkish Parliament in 1991, but sentenced to 15 years in prison by the Turkish courts for being members or supporters of the PKK. Finally, the HLP, Judge Fertig, and other individuals associated with the HLP have also assisted and trained some PKK members in using humanitarian law and international human rights law and in seeking a peaceful resolution of the conflict in Turkey. Both the HLP and Judge Fertig only support the PKK in its non-violent and lawful activities.

---

1. Although Judge Fertig is an administrative judge for the United States Equal Employment Opportunity Commission, he sues solely in his personal capacity.

2. The HLP was absorbed by the International Educational Development, Inc. ("IED") in 1989.

The HLP is sometimes referred to as the International Educational Development, Inc.*Humanitarian Law Project ("IED*HLP"). The IED was formed in the 1950's by a group of Jesuit Fathers to conduct non-sectarian work to aid schools, hospitals, and impoverished third world communities.

Since the Secretary designated the PKK as a foreign terrorist organization, the HLP and Judge Fertig have been frustrated in their efforts to improve conditions for the Kurds living in Turkey. But for the AED-PA, they would continue to provide the forms of support which they had previously provided, and would provide further support as well. The HLP and Judge Fertig fear, however, that continuing to do so would subject them to criminal investigation, prosecution, and conviction.

The HLP, Judge Fertig, and individuals associated with the HLP would specifically like to, but are afraid to, provide support to the PKK in the following ways:

(1) solicit funds for, and make cash contributions to the PKK's political branch, for its lawful political work on behalf of the Kurds' human rights and for humanitarian assistance to Kurdish refugees;

(2) advocate on PKK's behalf before the UN Commission on Human Rights and the United States Congress;

(3) train the PKK in how to engage in political advocacy and on how to use international law to seek redress for human rights violations;

(4) write and distribute publications supportive of the PKK and the cause of Kurdish liberation;

(5) advocate for the freedom of Turkish political prisoners convicted of being PKK members or supporters;

(6) work with PKK members at peace conferences and other meetings toward the cause of peace and justice for the Kurds; and

(7) provide lodging to PKK members in connection with these activities.

HLP and Judge Fertig are committed to providing the above-mentioned support.[3] They have been deterred from providing it, however, fearing criminal sanctions under §§ 302 and 303 of the AEDPA.

*The LTTE and the Plaintiffs that Support it*

The LTTE was formed in 1976 with the goal of achieving self-determination for the Tamil residents of Tamil Eelam, the Northern and Eastern provinces of Sri Lanka.

Plaintiffs allege that the Tamils constitute an ethnic group that, for decades, has been subjected to human rights abuses and discriminatory treatment by the Sinhalese, who have governed Sri Lanka since the nation gained its independence from Great Britain in 1948. The Sinhalese constitute a numerical majority of Sri Lanka's population.

Plaintiffs further allege that the LTTE, to further its goal of self-determination for the Tamils, engages in: (1) political organizing and advocacy; (2) diplomatic activity; (3) the provision of social services and economic development through the establishment of a quasi-governmental structure in Tamil Eelam; (4) humanitarian aid to Tamil refugees fleeing from the Sri Lankan armed forces; and (5) defense of the Tamil people from human rights abuses.

The LTTE also administers a chain of orphanages in Tamil Eelam, including the Chensoilai and Kantharupan Orphanages. Through the Tamil Eelam Economic Development Organization, the LTTE supports the development of Tamil Eelam's economy, from agriculture to transportation. It also regularly issues publications regarding the political situation in Sri Lanka. It administers a civil police force that maintains public safety in areas under LTTE control. Finally, the LTTE administers the Tamil Eelam Education Secretariat that oversees children's educational services.

Six Plaintiffs—four membership organizations, an organizational Plaintiff, and an individual—seek to provide support to the LTTE. These Plaintiffs are committed to the human rights and well-being of the Tamils in Sri Lanka. Many members of these organizations, many of the individuals associated with the organizational plaintiff, and the individual Plaintiff, Dr. Nagalingam Jeyalingam, are Tamils born in Sri Lanka. Although they now reside in the United States and many are United States citizens, they still have close friends and family members living in Sri Lanka, many of whom have allegedly been the victims of abuses by the Sri Lankan government.

---

**3.** Judge Fertig would also like to solicit for and make contributions to the international cam-

paign to free political prisoners Zana, Dicle, Dogan, and Sadak.

*Ilankai Thamil Sangam*

Plaintiff Ilankai Thamil Sangam ("Sangam"), a New Jersey not-for-profit corporation founded in 1977 has approximately 135 members, most of whom are Tamils born in Sri Lanka. The Sangam's objectives are to promote the association of Tamils in the New York City metropolitan area, to promote knowledge of the Tamil language, culture, and heritage, and to provide humanitarian assistance to the Tamils in Sri Lanka, many of whom are refugees and orphans in need of the basic necessities of life, including food, clothing, and housing. The Sangam, as an organization, and many of its members, as individuals, would like to solicit and make donations of cash, clothing, food, including prepared food for infants, and educational materials, to the LTTE for humanitarian assistance to the Tamils in Sri Lanka. Sangam specifically wishes to support the LTTE-run Chensoilai and Kantharupan orphanages. Satanislaus Decl., ¶ 4.

Neither the Sangam nor its members seek to support any military or unlawful activities of the LTTE. The Sangam and its members have been deterred from providing the above-described aid by the AEDPA. They have been deterred from freely engaging in political discussions on the topic of soliciting and making donations to the LTTE and organizations affiliated with the LTTE.

*Dr. Nagalingam Jeyualingam*

Plaintiff Dr. Nagalingam Jeyualingam is a naturalized United States citizen who is a Tamil from Sri Lanka. Dr. Jeyualingam, a surgeon, was President of Sangam from 1995 to 1997 and is currently one of its committee members. Members of Dr. Jeyualingam's family, including his mother, brothers, and sisters, were displaced from their homes and forced to flee from Sri Lanka to India as refugees in 1983.

Dr. Jeyualingam has made cash donations to organizations that provided assistance to Tamil refugees in Sri Lanka and encouraged others to make such donations. Dr. Jeyalingam believes that the LTTE plays a crucial role in providing humanitarian aid, social services, and economic development to the Tamils in Sri Lanka. But for the AEDPA, Dr. Jeyualingam would support the lawful and non-violent activities of the LTTE by providing the following:

(1) food and clothing to the Tamil Eelam Economic Development Organization, a branch of the LTTE engaged in economic development activities in Tamil Eelam including assisting refugees, implementing plans to develop the area's agriculture, forestry, fishing, and industries, and conducting environmental surveys;

(2) school supplies, books, and other educational materials to the Tamil Eelam Education Secretariat;

(3) money to the LTTE to pay for its legal fees and costs in challenging the Secretary's decision to designate the LTTE as a foreign terrorist organization;

(4) money to support the LTTE's political work, including the dissemination of written publications describing the plight of the Tamils in Sri Lanka to exile communities around the world; and

(5) money to support the LTTE's work in providing medical and rehabilitative assistance to Tamil victims of landmine explosions.

Dr. Jeyualingam only wishes to support the LTTE' humanitarian, social, and political efforts, and does not wish to support the LTTE's military activities. Dr. Jeyualingam wishes to but is afraid to provide assistance for fear of criminal prosecution.

*Tamils of Northern California*

Plaintiff Tamils of Northern California ("TNC"), a California not-for-profit organization founded in 1994, has approximately 120 members, most of whom are Tamils who were born in Sri Lanka and who are United States citizens and non-citizens. TNC's primary objectives include providing opportunities for Tamils in the Northern California area to share their knowledge of Tamil culture, politics, and history, and providing humanitarian assistance to the Tamils of Sri Lanka.

The TNC and its members would like to donate money as well as children's supplies, including infant formula, baby food, children's shoes and clothing, school books, and

toys, to the LTTE-run orphanages. They seek to do so as a means of expressing their support for the self-determination of the Tamil people in Sri Lanka. Neither the TNC nor its members seek to support the LTTE's military activities. The TNC and its members have been deterred from providing such support for fear that they will be criminally prosecuted under the AEDPA.

*World Tamil Coordinating Committee*

Plaintiff World Tamil Coordinating Committee (the "WTCC"), an organization based in Jamaica, New York, has distributed LTTE literature and informational materials throughout the United States since 1987 to advocate on behalf of the Sri Lankan Tamils' human rights. Part of the WTCC's founding purpose is to advocate on behalf of the human rights and self-determination of the Sri Lankan Tamils. Since the enactment of the AEDPA, many individuals who were receiving LTTE literature from the WTCC have asked the WTCC to stop distributing it to them because they fear that it could lead to criminal investigation, prosecution, and conviction. Many of the WTCC's former donors have stopped making contributions out of fear of criminal investigation and prosecution for providing material support to the LTTE. The WTCC does not intend any of its activities to further any illegal ends.

*Federation of Tamil Sangams of North America*

Plaintiff Federation of Tamil Sangams of North America ("FETNA") is a non-profit corporation founded in 1986. FETNA's membership includes 30 Sangams in the United States. The FETNA member Sangams are comprised mainly of United States citizens and legal permanent residents who are ethnic Tamils from all over the world, including India and Sri Lanka.

FETNA's purposes are to encourage appreciation of Tamil language, literature, arts, cultural heritage and history, and friendship among the Tamils and the Tamil Sangams around the world. FETNA, its member Sangams, and its individuals members would like to make donations to the LTTE for humanitarian assistance to Tamil refugees in Sri Lanka. They are afraid, however, of being criminally prosecuted for doing so.

FETNA does not seek to support any unlawful or military activities of the LTTE.

*Tamil Welfare and Human Rights Committee*

Finally, Plaintiff Tamil Welfare and Human Rights Committee ("TWHRC") is a Maryland association of approximately 100 Tamils, both United States citizens and non-citizens. Its primary objectives are to protect the human rights of the Tamils in Sri Lanka and to promote their health, social well-being, and welfare. Its members are concerned about the destitute Tamil refugees in the war-torn areas of Northeast Sri Lanka who have lost their homes and been forced to flee. The TWHRC, as an organization, and its members, as individuals, would like to provide money to the major organizations in Sri Lanka that provide direct relief, medical, and social services to these refugees, including the Tamil Eelam Economic Development Organization. Because of the AEDPA, however, the TWHRC and its members have been deterred from doing do. The TWHRC seeks only to support the LTTE's humanitarian efforts and does not seek to support the LTTE's military activities.

## II. Procedural Background

On March 19, 1998, Plaintiffs filed their complaint against Defendants alleging three causes of action. Plaintiffs' complaint specifically alleges that §§ 302 and 303 of the AEDPA violate:

(1) the First Amendment's guarantees to freedom of speech and association and to petition the government for a redress of grievances because they criminalize the provision of material support or resources to designated foreign terrorist organizations without a specific intent to further the organization's unlawful ends;

(2) the First and Fifth Amendment by granting the Secretary of State unreviewable authority to designate foreign organizations as terrorist organizations, which invites impermissible viewpoint discrimination; and

(3) the First and Fifth Amendment because the terms "material support and resources" and "foreign terrorist organi-

zation" are impermissibly vague, fail to provide adequate notice of prohibited activity, and give government officials unfettered discretion, causing individuals to avoid protected First Amendment activity.

On March 26, 1998, Plaintiffs filed the instant motion for preliminary injunction. Defendants timely filed their Opposition on April 23, 1998. On May 11, 1998, Plaintiffs timely filed their Reply.

### III. Preliminary Injunction Standard

Traditionally, a court may issue a preliminary injunction if it determines: (1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and, depending on the nature of the case, (4) the public interest favors granting relief. *International Jensen v. Metrosound U.S.A.*, 4 F.3d 819, 822 (9th Cir.1993).

Under the "alternative standard," a party may obtain a preliminary injunction, by demonstrating *either*: (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *Id.* "The alternative standards are not separate tests but the outer reaches of a single continuum." *Id.* (quotation omitted). Essentially, the trial court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Schwarzer & Tashima, *Federal Civil Procedure Before Trial*, at 13:39.

### IV. Plaintiffs' Argument That the AEDPA Is Unconstitutional Based on Guilt By Mere Association

Plaintiffs contend that the AEDPA is unconstitutional because it criminalizes Plaintiffs' exercise of their rights to freedom of speech and association protected by the First Amendment. Specifically, Plaintiffs argue that by imposing criminal sanctions on Plaintiffs' association with the PKK and LTTE without first demonstrating that Plaintiffs specifically intend to further those groups' illegal aims, the AEDPA imposes guilt by mere association in violation of the First Amendment. Plaintiffs assert, therefore, that because the AEDPA "gravely threatens their core First Amendment rights," and Plaintiffs are likely to succeed on the merits of their challenge to the AEDPA, this Court should grant their motion for preliminary injunction.

However, before the Court can address the merits of Plaintiffs' argument that the AEDPA is unconstitutional pursuant to the First Amendment, thereby entitling Plaintiff to a preliminary injunction, the Court must first determine whether the conduct proscribed by the AEDPA implicates the First Amendment and to what level of judicial scrutiny the AEDPA should be subjected. The Court does so below.

### A. The AEDPA'S Ban on Providing Any Material Support to Terrorist Organizations Implicates Activities Afforded Protection Pursuant to the First Amendment

#### 1. The Right to Freedom of Association

The Supreme Court recognizes that the First Amendment right to freedom of association encompasses both a right to "maintain certain intimate human relationships," and "a right to associate for the purpose of engaging in those activities protected by the First Amendment." *Roberts v. United States Jaycees*, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). The latter includes the "freedom to associate with others for the common advancement of political beliefs and ideas." *Buckley v. Valeo*, 424 U.S. 1, 15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (internal quotations and citations omitted); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 933, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (explaining that "the right of individuals to combine with other persons in pursuit of a common goal by lawful means" is protected by the First Amendment).

Although protected, "it is clear that '[n]either the right to associate nor the right to participate in political activities is absolute.'" *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Thus, the government may interfere with the right to political association if it "demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary

abridgment of associational freedoms." *Id.* Moreover, although the Supreme Court has upheld the First Amendment right of citizens to receive information from foreign organizations, *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), "the right of Americans to associate with nonresident aliens 'is not an absolute.'" *DKT Memorial Fund Ltd. v. Agency for Int'l Development,* 887 F.2d 275, 295 (D.C.Cir.1989) (citing *Palestine Information Office v. Shultz,* 853 F.2d 932, 941 (D.C.Cir. 1988)).

Plaintiffs argue that the AEDPA impinges on their freedom to associate with the PKK and LTTE by prohibiting Plaintiffs from making financial and material contributions to the organizations' humanitarian and political causes. The act of contributing money to political organizations has been upheld as an exercise of an individual's right to freedom of association. *See Buckley,* 424 U.S. at 16–17, 96 S.Ct. 612 (explaining that "this Court has never suggested that the dependence of a communication on the expenditure of money operates itself to introduce a non-speech element or to reduce the exacting scrutiny required by the First Amendment"); *see also American–Arab Anti–Discrimination Committee v. Reno,* 119 F.3d 1367, 1376 (9th Cir.1997), *cert. granted in part,* — U.S. ——, 118 S.Ct. 2059, 141 L.Ed.2d 137 (1998) ("*American–Arab II* ") (finding plaintiffs' associational activities included fundraising); *In Re Asbestos School Litig.,* 46 F.3d 1284, 1294 (3rd Cir.1994) (cited favorably by *American–Arab Anti–Discrimination Committee v. Reno,* 70 F.3d 1045, 1058 (9th Cir.1995) ("*American–Arab I* ") (explaining that "[j]oining organizations that participate in public debate, making contributions to them, and attending their meetings are activities that enjoy substantial First Amendment protection.").

 Thus, because the AEDPA prohibits any financial contributions to designated terrorist organizations, it affects Plaintiffs' First Amendment right to associate with the PKK and LTTE by making contributions to or fundraising on behalf of their political factions. However, not all of the activities proscribed by the AEDPA implicate protected First Amendment rights. For instance, Plaintiffs' ability to provide false documenta-

tion or identification, weapons, lethal substances, or explosives to the PKK or LTTE is not protected by the right to freedom of association. *See, e.g., NAACP v. Claiborne,* 458 U.S. at 916, 102 S.Ct. 3409 (finding that the "First Amendment does not protect violence" and therefore "the use of weapons . . . may not constitutionally masquerade under the guise of 'advocacy'") (internal citations omitted); *Palestine Information Office v. Shultz,* 853 F.2d 932, 941 (D.C.Cir.1988) ("*PIO* ") (explaining that the government may impose limitations or regulations on "free association conducted for an illegitimate purpose").

However, the fact that the AEDPA burdens protected First Amendment rights is only the first step of the Court's analysis. Next the Court must determine to what extent the implicated activities are protected in order to determine the standard of review the Court should apply.

**2. Applicable Level of Scrutiny to Determine Constitutionality of the AEDPA's Bar on Associational Activities**

 Statutory classifications are generally "valid if they bear a rational relation to a legitimate governmental purpose. Statutes are subjected to a higher level of scrutiny if they interfere with the exercise of a fundamental right, such as freedom of speech . . . .'" *Bullfrog Films, Inc. v. Wick,* 847 F.2d 502, 509 (9th Cir.1988). Because the Act interferes to some extent with Plaintiffs' exercise of freedom of association, the Act is subject to a heightened scrutiny. However, whether the Court should apply a strict scrutiny standard to the AEDPA's interference with Plaintiff's First Amendment rights or a less exacting intermediate level of scrutiny depends on the nature of the AEDPA's burden on those rights.

 A regulation that prohibits expression or association based on disapproval of the content of the speech is subject to the most exacting scrutiny. *See R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (generally First Amendment prohibits government from "proscribing speech or even expressive conduct, because of disapproval of the ideas expressed") (citations omitted); *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d

333 (1988) (indicating that "a content-based restriction on political speech in a public forum ... must be subjected to the most exacting scrutiny"). Thus, a regulation that infringes on an individual's right to associate with others because of the association's expression or advocacy of a particular subject or view will be upheld only if the government "demonstrates a sufficiently important interest and necessary abridgment of associational freedoms." *Buckley,* 424 U.S. at 25, 96 S.Ct. 612.

▮▮▮▮▮ However, when the government's regulation is unrelated to the suppression of a particular message or idea, it is content-neutral and subject to an intermediate level of scrutiny. *Turner Broadcasting Sys. v. FCC,* 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). If a content-neutral regulation is aimed at the noncommunicative nature of expressive conduct, but incidentally infringes on First Amendment freedoms,[4] the regulation may be upheld upon a balancing of the importance of the Government's interest and the extent to which First Amendment activity is infringed. *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Moreover, the Supreme Court acknowledges that the First Amendment does not protect all modes of communication of ideas by conduct:

> We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.... This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.... [W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression;

and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 376–77, 88 S.Ct. 1673 (footnotes omitted). Thus, content-neutral regulations that have an incidental effect on First Amendment rights will be upheld if they further "an important or substantial governmental interest." *See Walsh v. Brady,* 927 F.2d 1229, 1235 (D.C.Cir.1991) (quoting *O'Brien,* 391 U.S. at 377, 88 S.Ct. 1673). Whether the Court applies a strict scrutiny analysis or an intermediate scrutiny/*O'Brien* analysis, therefore, depends on whether the AEDPA's bar on providing material support prohibits Plaintiffs' association with the PKK and LTTE because these organizations and/or Plaintiffs engage in disfavored speech, or whether the AEDPA is aimed at prohibiting noncommunicative action that incidentally limits the activities by which Plaintiffs are able to express their political association with the PKK and LTTE.

Plaintiffs argue that the AEDPA is subject to the most exacting scrutiny because it imposes criminal sanctions on Plaintiffs for providing material support to designated terrorist organizations despite Plaintiffs' lack of specific intent to further the organizations' unlawful ends. Plaintiffs seek to provide direct monetary contributions, as well as physical materials, such as educational materials, both of which are prohibited by the AEDPA. 18 U.S.C. § 2339A(b) (defining material support as including currency and physical assets). Thus, Plaintiffs contend that the AEDPA "violate[s] a cardinal principle of the First Amendment: [it] impose[s] guilt by association, 'an impermissible basis upon which to deny First Amendment rights.'" Mot. at 19:14–16 (citing *Healy,* 408 U.S. at 186, 92 S.Ct. 2338).

Plaintiffs also argue that the AEDPA is a content-based regulation subject to strict scrutiny because the AEDPA's ban on their contribution of monetary and physical aid to the PKK and LTTE, acts that are expressive in nature, is directed at Plaintiffs' association

---

4. In other words, the government in pursuing other goals infringes on the right to freedom of expression or to association "by limiting an activity through which information and ideas might be conveyed, or ... by enforcing rules compliance with which might discourage the communication of ideas or information." Laurence H. Tribe, *American Constitutional Law* § 12–2 at 789–90 (2d Ed.1988).

with these organizations in particular. Reply at 4:23–5:1. Defendants contend, however, that the AEDPA is subject at most to an intermediate standard of review because the AEDPA's regulation of material support to designated terrorist organizations is not directed at suppressing Plaintiff's right to associate with those groups, but at the act of providing material support to the designated organizations. Opp. at 14:2–8.

Although the AEDPA bars the "act" of providing material support, rather than direct speech regarding the designated terrorist organizations, communication related to First Amendment speech is often made possible by contributing money. *Buckley,* 424 U.S. at 16, 96 S.Ct. 612 (explaining that "[s]ome forms of communication made possible by the giving and spending of money involve speech alone, some involve conduct primarily, and some involve a combination of the two. Yet this Court has never suggested that the dependence of a communication on the expenditure of money operates itself to introduce a nonspeech element or to reduce the exacting scrutiny required by the First Amendment."). Contribution of funds to further political expression is considered a direct exercise of an individual's freedom of expression and freedom to associate with an organization that participates in public debate. *Id.* at 424 U.S. at 24, 96 S.Ct. 612 (applying strict scrutiny to act limiting contributions to political candidates where "the primary First Amendment problem raised by the Act's contribution limitations is their restriction of one aspect of the contributor's freedom of political association"); *In re Asbestos School Litig.,* 46 F.3d at 1294 (finding that making contributions to organizations that participate in public debate is an activity

that "enjoy[s] substantial First Amendment protection").

▮▮▮▮ Notwithstanding its obstruction of material support to specified organizations, the Court finds that the AEDPA is in fact a content-neutral regulation of Plaintiffs' political speech and association. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based, . . . [whereas] laws that . . . impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner Broadcasting,* 512 U.S. at 643, 114 S.Ct. 2445. The AEDPA's burden on Plaintiffs' right to make political contributions to the PKK and LTTE is not imposed because the government disfavors the political speech promoted by the PKK and LTTE, as distinguished from the political views of other groups not subject to the statute.[5] Rather, Congress prohibits all material support to the PKK and LTTE, because pursuant to her delegated authority, the Secretary has determined that these organizations engage in terrorist activity that threatens "the national defense, foreign relations, or economic interests of the United States." 8 U.S.C. §§ 1189(a)(1) and 1189(c)(2).

Thus, the prohibition of material support to the PKK and LTTE is not aimed at the *content* of Plaintiffs' political expression. As a content-neutral restriction on Plaintiffs' right to political association, therefore, the AEDPA's prohibition on political contributions to the PKK and LTTE is subject to an intermediate level of scrutiny.[6] *See Turner Broadcasting,* 512 U.S. at 642, 114 S.Ct. 2445 (explaining that "regulations that are unrelated to the content of speech are subject to

---

**5.** Plaintiffs contend that the AEDPA does prohibit Plaintiffs' association with the terrorist organizations based on their unpopular viewpoints. Plaintiffs seek support for this contention by the fact that the Irish Republican Army ("IRA"), has not been designated a "terrorist organization." However, Plaintiffs offer no proof that the Secretary designates what is a terrorist organization based on the beliefs those organizations hold. For further discussion on the Secretary's designation of organizations as "terrorist," see Section V.B., infra.

**6.** Moreover, in *Buckley* the Supreme Court found that the limitations on campaign contributions

regulated conduct in part because "the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful." *Buckley,* 424 U.S. at 16, 96 S.Ct. 612. Thus, it applied strict scrutiny, rather than an intermediate level of scrutiny to the regulation.

In contrast, as explained above, the government's interest in regulating Plaintiffs' ability to contribute to the PKK and LTTE does not arise because it finds the *message* communicated by Plaintiffs' activities, such as a showing of support for the political agenda promoted by the PKK and LTTE, dangerous. Rather, the AEDPA was

an intermediate level of scrutiny, because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue") (citations omitted).

In addition to prohibiting political contributions, the AEDPA also bars Plaintiffs from contributing "other physical assets" to the PKK and LTTE. While Plaintiffs might wish to donate materials to the PKK and LTTE, such as educational materials, because they agree with these groups' political and humanitarian goals, Plaintiffs do not cite to and the Court has not found any authority suggesting that the *act* of donating material goods to an organization is protected expressive conduct in the same sense or degree as contributing funds or paying membership dues to a political organization. Furthermore, even if Plaintiffs' First Amendment rights are implicated by their contribution of "physical assets," because the AEDPA's prohibition is directed at Plaintiffs' *conduct*, rather than at any communicative element Plaintiffs' donations of "physical assets" might impart, its provisions are subject to the intermediate standard articulated in *O'Brien.*

Finally, "First Amendment rights must always be applied 'in light of the special characteristics of the ... environment' in the particular case." *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). In this instance, Plaintiffs seek to assert their First Amendment right to associate with *foreign* organizations. However, "the right of Americans to associate with nonresident aliens 'is not an absolute.'" *DKT Memorial Fund*, 887 F.2d at 295. Rather, in considering Plaintiffs' claim that the AEDPA infringes on their right to associate with the PKK and LTTE, the Court "must weigh their interests against those of the government." *PIO*, 853 F.2d at 932.

Based on this analysis, the Court will analyze the challenged provisions under *O'Brien*'s intermediate standard.

## B. Constitutionality of the AEDPA's Prohibition on Plaintiffs' Ability to Provide Material Support to the PKK and LTTE

With the above in mind, the Court now determines whether the AEDPA's provisions criminally prohibiting Plaintiffs from providing material support to the PKK and LTTE violates the First Amendment.

### 1. The AEDPA's Imposition of Criminal Sanctions for Providing Material Support to Designated Terrorist Organizations Without Requiring a Finding of Specific Intent to Further Terrorist Activities Does Not Violate the First Amendment

Plaintiffs primarily contest the constitutionality of the AEDPA on the basis that it imposes criminal sanctions on Plaintiffs' First Amendment activities with disfavored groups despite Plaintiffs' lack of specific intent to further those groups' illegal activities. Because Plaintiffs do not intend to further the illegal or violent activities engaged in by the PKK and LTTE, Plaintiffs argue that they are punished solely because they have chosen to associate with these organizations. Mot. at 19:21–20:1.

"[T]he First Amendment protects a citizen's right to associate with a political organization; even if that association includes ties with groups that advocate illegal conduct or engage in illegal acts, the power of the Government to penalize association is narrowly circumscribed." *American–Arab I*, 70 F.3d at 1066. Thus, the Supreme Court has "consistently disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization." [7] *Healy v. James*, 408 U.S. 169, 185–

enacted because Congress found the provision of material support, even to the legitimate activities of the PKK and LTTE, enables terrorist organizations to divert funds to terrorist activities that harm the United States' national security and foreign policy. Thus, the AEDPA is not directed to the communicative aspect of Plaintiffs' donation—Plaintiffs' desire to associate with and promote the political and humanitarian goals of the PKK and LTTE—but to the noncommunicative

impact of providing material support to these organizations. *O'Brien*, 391 U.S. at 376–377, 88 S.Ct. 1673 (upholding statute criminalizing conduct involving expressive First Amendment speech and nonspeech elements where statute directed at the noncommunicative impact of the conduct).

7. *See generally United States v. Robel*, 389 U.S. 258, 265, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Keyishian v. Board of Regents*, 385 U.S. 589, 606,

86, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). "'[G]uilt by association alone' . . . is an impermissible basis upon which to deny First Amendment rights." *Id.* at 186, 92 S.Ct. 2338 (citation omitted); *see also United States v. Robel,* 389 U.S. 258, 264–65, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (finding that "guilt by association alone," even in the name of national defense, violates the First Amendment.). Rather, the government must "establish [the individual's] knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims." *Healy,* 408 U.S. at 186, 92 S.Ct. 2338. Therefore, "the critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not." *Id.* at 192, 92 S.Ct. at 2351.

Defendants do not dispute that the AEDPA authorizes criminal sanctions without requiring a "specific intent" to further the designated terrorist organizations' illegal activities. Rather, Defendants argue that "[t]he AEDPA does not prohibit [P]laintiffs from advocating on behalf of . . . the PKK and LTTE, or from associating with others in furtherance of their advocacy goals." Opp. at 17:8–11; 18:25–2. Thus, Defendants contend that the AEDPA does not offend the First Amendment principle that the government cannot punish individuals for associating with a disfavored organization absent a showing of "specific intent" to further its illegal activities.

Plaintiffs rely heavily on *American–Arab I* and *American–Arab II* (together, "*American–Arab* ") to support their contention that Defendants must demonstrate Plaintiffs' specific intent to further the PKK's and LTTE's illicit activities before they can punish Plaintiffs for providing material support to the PKK's and LTTE's political and humanitarian branches. Specifically, Plaintiffs contend that because the acts of making political contributions and engaging in fundraising activi-

ties are acts of association, Plaintiffs are subject to criminal sanctions based on their mere association with politically unpopular organizations. However, even though Plaintiffs' acts of contributing to the political factions of the PKK and LTTE are "acts of association," the Court finds that the AEDPA does not impose "guilt by association alone."

First, the Court finds the *American–Arab* cases distinguishable from the instant action. In *American–Arab I,* the Ninth Circuit enjoined the selective enforcement of immigration laws in violation of the First Amendment rights of six resident aliens. The court found that the aliens provided sufficient evidence of a discriminatory motive for prosecution by demonstrating that the government targeted them for deportation because of the aliens' membership in and "associational activities with particular disfavored groups" and the government's subsequent failure to establish that the aliens sought to further the illegal goals of the group in question.[8] *American–Arab I,* 70 F.3d at 1063.

In *American–Arab II,* the government, claiming new evidence that the aliens were involved in fundraising activity, argued that the case should be analyzed under the standard set forth in *O'Brien,* "[b]ecause activity, rather than mere association, is at issue." *American–Arab II,* 119 F.3d at 1376. The court, however, in rejecting the government's argument explained that in *American–Arab I:*

> We emphasized that the government was required to show that the [aliens] had the "specific intent" to engage in illegal group aims because the [aliens] had demonstrated that they were *targeted* for their "*associational activities with particular disfavored groups.*" In making this statement, we had before us evidence that these associational activities included fundraising.

87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Elfbrandt v. Russell,* 384 U.S. 11, 19, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); *Noto v. United States,* 367 U.S. 290, 299–300, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961); *Scales v. United States,* 367 U.S. 203, 221–22, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961).

**8.** In opposing the preliminary injunction, the government did not attempt to show that the

aliens' association with the terrorist organization in question met the "specific intent" standard enunciated in *Healy* and its predecessors. Rather, the government argued that aliens are not entitled to the same First Amendment protections as citizens. *American–Arab I,* 70 F.3d at 1063.

Thus, we already have made it clear that *targeting* individuals because of activities such as fundraising is impermissible unless the government can show that group members had the specific intent to pursue illegal group goals.

*American–Arab II,* 119 F.3d at 1376 (emphasis added; emphasis on "activities" in original). In addition, the court found *O'Brien* inapplicable because "the central issue is whether the government impermissibly *targeted* the [aliens] due to their *affiliation* with [the group in question], and did not so target aliens affiliated with other foreign-dominated organizations advocating violence and, destruction of property," which is a *content-based* distinction. *Id.* (emphasis added). Finally, the court found that the government had never challenged the lower court's finding that it "targeted the [aliens] for their mere association with" the disfavored organization. *Id.*

Based on the *American–Arab* holdings, therefore, Plaintiffs argue that the AEDPA violates the First Amendment by allowing the government to target Plaintiffs for their protected associational activities of providing contributions and fundraising, without demonstrating Plaintiffs' specific intent to further the illegal goals of the PKK and LTTE. *American Arab,* however, involved the selective prosecution of individuals who were "targeted" in *retaliation* for their association with a group espousing political views with which the government did not agree, rather than the constitutionality of a statute. Plaintiffs have presented no evidence that their activities of contribution and fundraising are prohibited because the Government wants to retaliate against Plaintiffs for affiliating with the PKK and LTTE or because the Government disfavors the PKK's and LTTE's political views.

Moreover, although the AEDPA designates specific organizations to which Plaintiffs may not provide material support, this designation is not founded on the political viewpoints or subject matter that the organizations promote. Rather, the designation is based on whether the organization engages in terrorist activity.[9] In other words, the AEDPA is not a content-based restriction such as that in *American–Arab*, because it does not permit prosecution for providing material support to designated terrorist organizations with disfavored views, while authorizing material support to designated organizations with whose views the government tolerates.

Finally, in *American–Arab II,* the court determined that because the aliens had already demonstrated the government's impermissible motive in prosecuting them based on their *mere affiliation* with a disfavored group, the fact that they were *also* targeted because of their fundraising activities did not transform the government's improper motive to a permissible one. *American–Arab II,* 119 F.3d at 1376. Therefore, because the government did not contest that it targeted the aliens merely because they were *affiliated* with an unpopular group, the government could only demonstrate that it legitimately prosecuted the aliens by establishing their specific intent to further the group's illegal goals.[10]

More importantly, in addition to finding *American–Arab* inapplicable to the Court's constitutional analysis of the AEDPA, the Court finds that the AEDPA does not criminalize *mere* association with designated terrorist organizations by prohibiting the provision of material support regardless of the donor's intent. First, in the cases cited by Plaintiff examining the constitutionality of

---

**9.** Assuming the authority to designate organizations "terrorist" is proper (discussed *infra* in Section V.B), absent a showing that the Secretary has designated the PKK or the LTTE as terrorist organizations based on their disfavored political views, the government is entitled to specify particular organizations as national threats. *Communist Party of the United States v. Subversive Activities Control Board,* 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625(1961) (upholding regulation designating communist-action organizations).

**10.** Moreover, the government initiated deportation proceedings against at least two of the aliens pursuant to an act rendering deportable "any alien who has engaged, is engaged, or at any time after entry engages in terrorist activity." *American–Arab I,* 70 F.3d at 1054 (citing 8 U.S.C. § 1251(a)(4)(B) (1994)). Thus, by reason of the statute the government would have to demonstrate that the aliens specifically intended to "engage in terrorist activity."

statutes punishing an individual's association with specific organizations, the courts have required a finding of specific intent to further the illicit aims of the organization where the statute punishes *mere membership* in or *advocacy* of the group's political beliefs.[11] The AEDPA, in contrast, does not prevent Plaintiffs from affiliating with or advocating on behalf of the PKK or LTTE. The AEDPA, therefore, cannot be said to impose punishment for Plaintiffs' "association alone" or "mere association with" the PKK and LTTE, as Plaintiffs are not prohibited from joining with others to express their ideas about or advocate on behalf of the PKK and LTTE or from advancing the PKK's and LTTE's political agenda. Thus, the AEDPA limits the permissible *ways* in which Plaintiffs can associate with the PKK and LTTE, rather than punishing Plaintiffs' ability to exercise their First Amendment right to associate with the PKK and LTTE altogether.[12]

Second, while contributing money to or fundraising on behalf of political organizations is an expression of political association, the AEDPA's purpose behind prohibiting these associational activities is *not* to impede Plaintiffs from disseminating their political views, ideas or agenda, or to punish Plaintiffs because these activities support an organization whose political views are disfavored by the government. Thus, the AEDPA's punishment of associational activities without specific intent to further illegal goals does not target the nature of the ideas expressed through Plaintiffs' associational activities, as in *Healy* and its predecessors.

**2. Application of *O'Brien*: Balancing Governmental Interest vs. Impact on First Amendment Rights**

 Although the Court finds that the AEDPA does not impose "guilt by association alone" in violation of the First Amendment, because the AEDPA's prohibition of material support interferes with Plaintiffs' associational activities, the Court must deter-

mine if the government's interest in enacting the AEDPA justifies its impact on the First Amendment. Because the Court has found that the AEDPA's restrictions are content-neutral and are directed at the noncommunicative elements of Plaintiffs' actions, the Court applies the intermediate level of scrutiny. As articulated in *O'Brien*, in analyzing whether a content-neutral regulation that affects First Amendment activity is justified, the Court must determine the following:

(1) whether the regulation is within the power of the government;

(2) whether the regulation furthers an important or substantial governmental interest;

(3) whether the proffered interest is unrelated to the suppression of free expression; and

(4) whether the incidental restriction on First Amendment freedoms is no greater than is essential to further the important interest.

*O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673. The Court applies the *O'Brien* intermediate scrutiny test below.

### a. *Power of Government to Enact the AEDPA*

 "The Supreme Court has long recognized the broad authority accorded the national government in the foreign policy realm." *PIO*, 853 F.2d at 940 (citing *Regan v. Wald*, 468 U.S. 222, 242, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984)). The Court finds that the enactment of the AEDPA is within the constitutional power of the government.

### b. *The AEDPA Furthers an Important and Substantial Government Interest*

Congress enacted the AEDPA's provision proscribing all material support and resources to designated foreign terrorist organizations "[i]n the interest of law en-

---

**11.** *See, e.g., Healy,* (holding that school's refusal to recognize student group because students associated with organization whose "philosophy [is] antithetical to school's policies, and that the group's independence [from the organization] was doubtful" an impermissible denial of right to associate); *Robel,* (holding act denying employment based on *membership* in communist action

organization, without more, unconstitutional); *Elfbrandt* (finding unconstitutional an employment loyalty oath requiring employee not be a *member* of an organization advocating overthrow of government).

**12.** The Court will discuss the constitutionality of imposing these limitations below.

forcement and national security, and in furtherance of U.S. foreign relations." McKune Decl., ¶ 7.[13] Specifically, the AED-PA was designed to "strictly prohibit terrorist fundraising in the United States." House Report 104–383 at 43 (explaining "background and need" for legislation prohibiting material support to terrorist organizations). Moreover, upon finding that many terrorist "organizations operate under the cloak of a humanitarian or charitable exercise," Congress determined that "there is no other mechanism, other than an outright prohibition on contributions, to effectively prevent such [terrorist] organizations from using funds raised in the United States to further their terrorist activities abroad." *Id.* at 43–45. The AED-PA includes Congress's specific finding that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." AEDPA § 301(a)(7), 18 U.S.C. § 2339B note.

 Without question, the government's interest in national security is a compelling one, permitting the government to impose restrictions on citizens' ability to maintain associations with foreign entities. *See e.g., Bullfrog Films,* 847 F.2d at 509 n. 9 ("in the *absence* of some overriding interest, such as national security, the First Amendment protects communications with foreign audiences to the same extent as communications within our borders") (internal quotations omitted); *PIO,* 853 F.2d at 940 (government has a substantial interest in "closing foreign missions representing foreign entities that [the United States] do[es] not recognize"); *Farrakhan v. Reagan,* 669 F.Supp. 506, 510–12 (D.C.D.C.1987), *aff'd without opinion,* 851 F.2d 1500, 1988 WL 76623 (1988) (government has a "compelling" interest in national security and ending "state-sponsored" terrorism).

Plaintiffs, however, do not contest that the government has a compelling interest in its national security and foreign policy in preventing "the United States [from being used]

as a staging ground for those who seek to commit acts of terrorism against persons in other countries." House Report 104–383 at 43. Rather, Plaintiffs contend that the AED-PA is directed at their freedom of expression and association and dispute whether the prohibition of contributions to further political and humanitarian ends "is no greater than essential" to further the government's interest in national security and foreign policy.

c. *The Government's Interest Behind Prohibiting Contributions for Political and Humanitarian Activities to the PKK and LTTE Is Not Related to the Suppression of Free Expression*

As the Court has set forth in Section IV. A.2., the AEDPA is not directed at suppressing Plaintiffs' political speech or advocacy of the PKK's and LTTE's political agenda. In preventing Plaintiffs from making political contributions to the PKK and LTTE, the government does not seek to silence the political doctrine of the PKK and LTTE. Rather, the AEDPA's prohibitions are aimed at precluding material support to terrorist organizations that divert funds raised for political and humanitarian resources to their terrorist activities, as well as preventing aid to terrorist organizations by enabling them to "defray the cost … of running legitimate activities [that] in turn frees an equal sum that can then be spent on terrorist activities." House Report 104–383 at 81.

Moreover, various courts have found constitutionally permissible similar governmental restrictions on association with specific foreign entities as a means to further the government's interest in national security and foreign policy. For example, in *PIO* the District of Columbia Circuit found that although the First Amendment right to association was implicated, the government's underlying interest in closing an organization acting as the foreign mission to the Palestine Liberation Organization ("PLO") did not relate to the suppression of free speech or association. *PIO,* 853 F.2d at 940. In addition, in finding the appellants' associational

---

**13.** Kenneth R. McKune is the Associate Coordinator for Counterterrorism in the United States Department of State. McKune Decl., ¶ 1. As such, he is "responsible for the formulation, coordination and implementation of United States foreign policy regarding international terrorism." *Id.*

interest "minimal" in comparison to the government's interest in foreign policy, the court explained that the closure "does not prevent [appellants] from associating with any individual or group of individuals. It does not even prevent them from 'associating' with the PLO in the normal sense of that word. It does not, for example, bar them from speaking to members of the PLO." *Id.* at 941.

Likewise, in *Walsh v. Brady*, 927 F.2d 1229 (D.C.Cir.1991), the court upheld the government's restrictions banning virtually all travel to Cuba, finding the government's interest in denying the flow of hard currency to Cuba unrelated to suppressing appellant's exercise of free speech. The court made this finding despite the fact that appellant wanted to travel to Cuba to acquire *political* posters. Similarly, in *Regan v. Wald,* 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984), the Supreme Court found the President's restrictions on travel to Cuba "justified by weighty concerns of foreign policy."

However, although the government's interest in prohibiting Plaintiffs from providing material support and resources to the PKK and LTTE is unrelated to suppressing Plaintiffs' political beliefs or affiliation with the PKK and LTTE, the AEDPA may not restrict Plaintiffs' First Amendment Freedoms more than is essential to further its interest.

d. *The AEDPA Restricts Plaintiffs' Right to Political Association and Expression No More Than Is Essential to Further its Interest*

Plaintiffs argue that the AEDPA restricts their First Amendment freedoms to a greater degree than is essential because it prohibits their support of the PKK's and LTTE's *legal* political and humanitarian activities. Plaintiffs note that the AEDPA's predecessor, the Violent Crime Control and Law Enforcement Act of 1994, specifically excepted from "material support," "humanitarian assistance to persons not directly involved" in terrorist activities. Opp. at 20:2–11; 18 U.S.C. § 2339A(a) (repealed by the AEDPA in 1996). However, the government enacted the AEDPA and specifically deleted this exception permitting contributions for humanitarian assistance, because it found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." AEDPA § 301(a)(7), 18 U.S.C. § 2339B note; McKune Decl., ¶ 7. In addition, Congress determined that the prohibition on *all* material support "is absolutely necessary to achieve the government's compelling interest in protecting the nation's safety from the very real and growing terrorist threat." House Report 104–383 at 45.

Moreover, in prohibiting *all* material support, Congress specifically "recognize[d] the fungibility of financial resources and other types of material support." H.R. Report 104–383, at 81. Because of this fungibility, therefore, Congress concluded that "[a]llowing an individual to supply funds, goods, or services to an organization ... helps defray the cost to the terrorist organization of running the ostensibly legitimate activities. This in turn frees an equal sum that can then be spent on terrorist activities." *Id.* Furthermore, "[g]iven the purposes, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions—regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities." McKune Decl., ¶ 8. Thus, in order to further the AEDPA's interest of obstructing funding to terrorist organizations for illegal activities, the AEDPA necessarily must prohibit *all* monetary contributions, although such a proscription restricts Plaintiffs from expressing their political association with the PKK and LTTE through political and humanitarian donations.[14]

Additionally, in the past, courts have upheld restrictions on constitutionally protected activities with foreign entities as essential to further the government's substantial interest

---

**14.** The Court's finding that the AEDPA's restriction on Plaintiff's First Amendment rights is no greater than is essential to further its interest is bolstered by the fact that the AEDPA does not completely bar Plaintiffs' associational activities with the PKK and LTTE or prevent Plaintiffs from promoting the organizations' political or humanitarian goals, as the Court has indicated throughout this Order.

in national security or foreign policy. For example, the Supreme Court has held that the government's restriction on virtually all travel to Cuba to further the government's interest in "curtail[ing] the flow of hard currency to Cuba—currency that could then be used in support of Cuban adventurism" to be a permissible prohibition on individuals' constitutional rights. *Wald*, 468 U.S. at 243, 104 S.Ct. 3026. *See also Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431 (9th Cir.1996) (*"Freedom to Travel"*) (upholding travel restrictions to Cuba as furthering governmental interest to restrict flow of hard currency into Cuba). Similarly, to prevent the flow of funds to terrorist organizations which could later be diverted to further illegal goals, the AEDPA permissibly prohibits any material support to designated terrorist organizations.

Furthermore, courts have upheld the prohibition of the receipt of publications from designated "enemy" countries, without a license, as permissible restrictions on First Amendment activities. *Teague v. Regional Comm. of Customs*, 404 F.2d 441 (2nd Cir. 1968); *Veterans and Reservists for Peace in Vietnam v. Regional Commissioner of Customs*, 459 F.2d 676 (3d Cir.1972) (*"Veterans"*). The regulations were upheld despite the fact that the publications in question expressed political viewpoints. Nevertheless, both the Second and Third Circuits found that the restrictions were not content-based because they required a license of *all* publications from the designated countries. Moreover, the means used by the Government to support its "vital interest" in restricting the flow of currency to the designated countries was deemed non-violative of the First Amendment.[15]

That the AEDPA restricts Plaintiffs' First Amendment freedoms no more than is essential to further its interest is supported by another district court case upholding the prohibition of contributions to a foreign entity. In *Farrakhan v. Reagan*, 669 F.Supp. 506 (D.C.D.C.1987), *aff'd without opinion*, 851 F.2d 1500, 1988 WL 76623 (1988), the court upheld economic sanctions against Libya which prohibited all economic intercourse with Libya, including contributions to *religious* organizations, as the least restrictive alternative to further the government's interest in national security. In so finding, the court stated that "in the face of the national security interest lying behind the sanction regulations [directed at Libya], we conclude that there is no alternative that would allow organizations to speak through contributions while still allowing the government to effectuate its legitimate and compelling interests in national security."[16] *Id.* at 512. Likewise, this Court cannot "reliably evaluate the detriment to the security interests of the United States, regardless of whether monetary transmissions are [for humanitarian or political purposes], because [it] cannot ascertain what will happen to the money once it reaches [designated terrorist organizations]. Conceivably, the money could be used for purely innocuous purposes, or it could be used, directly or indirectly, to subsidize the types of anti-United States activity that the [AEDPA] regulations aim to prevent."[17] *Id.*

Furthermore, the fact that the AEDPA may make it more difficult for Plaintiffs to advocate for the PKK and LTTE or to provide humanitarian assistance to the Tamils and Kurds does not render the AEDPA more restrictive than necessary. *See, e.g., Path-*

---

**15.** *Veterans*, 459 F.2d at 682 ("[i]n view of the great importance in assuring that United States currency does not fall into the wrong hands, we do not believe that the burden imposed [on individuals by answering interrogatories that result in the loss of anonymity] are [sic] unreasonable or excessive"); *Teague*, 404 F.2d at 446 (requiring license to obtain foreign publications permissible as "contribut[ing] to the furtherance of a vital interest of the government" to limit the flow of currency "to specified hostile nations").

**16.** The court also noted that to find that the First Amendment mandates that individuals are free to send money to Libya, a foreign state connected

with terrorism, "would be to open the door for any group or individual to send money anywhere as an act of symbolic speech." *Farrakhan*, 669 F.Supp. at 512.

**17.** In addition, the Court recognizes that because of the organizational structure of terrorist groups, the addition of a licensing requirement, see, for example, *Freedom to Travel* and *Teague*, or a provision enabling Plaintiffs to make donations into a blocked account, in order to lessen the AEDPA's impact on Plaintiffs' First Amendment rights, would also work to hamper the AEDPA's purpose.

*finder Fund v. Agency for Int'l Development,* 746 F.Supp. 192 (D.C.D.C.1990) (explaining that "a First Amendment violation is not found if governmental action has merely made it somewhat more difficult for domestic organizations to associate with the organizations of their choice"). Plaintiffs may continue to advocate the political and humanitarian causes of the PKK and LTTE despite the AEDPA's restriction. Plaintiffs just must do so through alternative means, such as spending money themselves to distribute information about the plight of the Kurds and Tamils or providing humanitarian aid either directly or indirectly through international humanitarian associations such as the Red Cross.

Finally, Plaintiffs contend that the AEDPA's ban on contributing physical assets to support lawful activities of designated organizations does not further its interest in preventing the "freeing-up" of assets and resources that can then be used by these organizations to support illegal activities.[18] Specifically, Plaintiffs argue that the AEDPA's allowance for donations of medicine and religious materials will result in this same "freeing-up" effect. Mot. at 24:7–9; Reply at 7:9–8:1.

However, in allowing an exemption for the contribution of religious materials, the AEDPA actually ensures that it does not impact First Amendment rights more than necessary to further its interest. This exception guarantees that Plaintiffs will not be punished for exercising their First Amendment right to freely exercise their religion. In addition, as Defendants note, "the statute's exemption of 'religious articles' responds to any contention by foreign terrorist organizations that the United States is acting under the AEDPA pursuant to an alleged animosity against religion or a particular religious faith." Opp. at 21 n. 15.

In addition, while the donation of medicine could also "free-up" financial resources with which terrorist organizations could further their illegal aims, the fact that Congress permits Plaintiffs to provide medicine but not "crayons" to designated organizations does not imply that the AEDPA restricts Plaintiffs' First Amendment rights to a greater degree than is essential. Providing medicine or crayons does not appear to the Court to invoke the First Amendment's protections in the first place because these donations are not expressive in nature, as is donating money to or paying membership dues to a political organization. However, even if the First Amendment is invoked by the act of donating medicine or educational supplies, it is not for the Court, but for Congress, to decide whether *authorizing* the donation of medicine thwarts the AEDPA's purpose to prevent funds from reaching the illegal activities of designated terrorist organizations.[19] Rather, the Court is to determine whether the AEDPA's *prohibition* on providing material support to terrorist organizations restricts First Amendment rights more than is essential, which, based on the above analysis, the Court does not find.

For all of the foregoing reasons, therefore, the Court finds that Plaintiffs have failed to

---

**18.** In addition, Plaintiffs argue that by allowing the donation of medicine and religious articles but prohibiting the donation of, for example, educational materials, the AEDPA "draws a content-based distinction between permissible and impermissible associational activities, a distinction that cannot possibly be justified by a compelling state interest." Mot. at 24:7–17. The Court, however, finds Plaintiffs' argument that the AEDPA's exemptions constitute a content-based restriction on First Amendment freedoms without merit. First, as has already been noted, the donation of physical assets is not expressive "speech-related" conduct. However, even if these types of contributions implicate Plaintiffs' expressive or associational rights under the First Amendment, for the AEDPA to be considered a content-based restriction, the AEDPA's distinction between permitting medicine but not permitting books would have to be based on the ideas or views or communicative content expressed by donating medicine versus donating books. *Turner Broadcasting,* 512 U.S. at 643, 114 S.Ct. 2445. However, in allowing medicine and religious materials, the AEDPA makes no reference to the views or ideas expressed by these donations (if donating medicine can in fact express a view), just as the AEDPA does not prohibit monetary contributions based on the political opinions associated with such contributions. Thus, the AEDPA is content-neutral. *Id.*

**19.** If Congress has determined that it wants to allow individuals to be able to donate medicine and religious materials to designated terrorist organizations, it is not for the Court to decide that Congress should not permit such exemptions in order to further the AEDPA's purpose as significantly as possible.

establish a probability of success on the merits on their claim that the AEDPA's prohibition on all material support to designated terrorist organizations, regardless of the individual's lack of intent to further illegal activities, violates their First Amendment rights to freedom of speech and association.[20] However, Plaintiffs also argue that the AEDPA violates the First and Fifth Amendment because it grants the Secretary unfettered discretion to designate terrorist organizations, and because its terms are impermissibly vague.

## V. Plaintiffs' Argument that Affording Secretary of State Unfettered Discretion to Blacklist Disfavored Organizations

Plaintiffs also contend that they are entitled to a preliminary injunction based on the independent ground that the Secretary has unfettered discretion to designate as terrorist any foreign group that uses force and whose actions threaten the foreign relations of the United States. This unfettered discretion, Plaintiffs argue, has the potential for impermissible viewpoint discrimination.

## A. Standing

As an initial matter, Defendants contend that "there is at the very least a significant issue about whether plaintiffs have standing

to bring a facial challenge to this aspect of the Act." Opposition at 24 n. 17.

 Under Article III of the Constitution, it is a jurisdictional prerequisite that plaintiffs present an actual "case or controversy." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). "To satisfy this requirement plaintiffs must show, inter alia, that they have standing." *American–Arab Anti–Discrimination Comm. v. Thornburgh,* 970 F.2d 501, 506 (9th Cir.1991). Thus, plaintiffs must demonstrate that they personally have suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (citations and omitted).

 "Although facial challenges to legislation are generally disfavored, they have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad." *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 223, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *see also Ward v. Rock Against Rac-*

---

**20.** The Court notes that even if it had applied a strict scrutiny analysis to the AEDPA's prohibition on Plaintiffs' monetary contributions to the PKK and LTTE, the Court would still find the Government's proffered justification for the prohibition on all monetary contribution constitutionally sufficient. As stated in *Buckley,* "[e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of association freedoms." 424 U.S. at 25, 96 S.Ct. 612 (internal quotations omitted). As the Court has demonstrated above, national security is a "sufficiently important interest."

In addition, the AEDPA's prohibition on all monetary support is "closely drawn to avoid unnecessary abridgment of associational freedoms" because it does not prohibit Plaintiffs from participating in other forms of political expression and association with the PKK and LTTE. Not only does the AEDPA's prohibition apply to all contributions to all designated terrorist organizations regardless of their political views, but as explained above, the AEDPA does not prevent Plaintiffs from engaging in political

expression or from advocating on behalf of or associating with others who believe in the causes championed by the PKK and LTTE. For example, Plaintiffs are free to spend money themselves, such as distributing information about the plight of the Kurds and Tamils; are free to associate with others to express their advocacy of the PKK's and LTTE's political and humanitarian goals; and are free to provide direct humanitarian aid to individuals who need it.

Thus, because of the compelling nature of the government's interest, and the fact that the AEDPA does not "undermine to any material degree the potential for robust and effective discussion" of the political ideas and views espoused by the PKK and LTTE, the Court finds that, even under this rigorous standard of review, the AEDPA's limitations on Plaintiffs' freedom of expression and association are constitutionally justified. *Buckley,* 424 U.S. at 28–29, 96 S.Ct. 612 (upholding campaign contribution limitations under strict scrutiny standard because individuals were free to engage in independent political expression).

*ism,* 491 U.S. 781, 793, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("Our cases permitting facial challenges to regulations that allegedly grant officials unconstrained authority to regulate speech have generally involved licensing schemes that 'ves[t] unbridled discretion in a government official over whether to permit or deny expressive activity.'") (quoting *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 755, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)). "[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *Id.* at 755–56, 108 S.Ct. 2138.

▮ In this case, Plaintiffs have standing to bring a facial challenge to the AEDPA based on their claim that it vests the Secretary with unfettered discretion. While the AEDPA does not involve a licensing scheme, per se, it operates in a similar fashion. The AEDPA allows the Secretary to determine which foreign organizations to designate as "terrorist" and are thus subject to the restrictions on providing material support. In *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), the Supreme Court analogized a criminal statute against picketing to a licensing scheme. The Court stated:

> One who might have had a license for the asking may therefore call into question the whole scheme of licensing when he is prosecuted for failure to procure it. A like threat is inherent in a penal statute, ... which does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech ....

*Id.* (citations omitted).

Because the AEDPA criminalizes the provision of material support to foreign terrorist organizations, it operates like a licensing scheme. The Secretary's designation has inhibited Plaintiffs from engaging in otherwise expressive conduct. Thus, similar to a licensing scheme, the Secretary's designation under the AEDPA is effectively a decision to permit or deny expressive conduct. For these reasons, the Court concludes that Plaintiffs have standing to raise a facial challenge to the Secretary's authority under the AEDPA.

## B. The Secretary's Authority

Plaintiffs argue that the AEDPA violates the First Amendment because it delegates to the Secretary unfettered discretion to designate a foreign organization as terrorist and thereby triggers substantial restrictions on protected speech and association. Thus, Plaintiffs argue that because the AEDPA does not impose a ban on support for *all* foreign terrorist organizations, the potential for discrimination exists and the Secretary may selectively enforce the AEDPA against supporters of particularly disfavored groups.

Article I, section 1 of the United States Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., Art. I, § 1. "Over time, the government has reached a 'practical understanding that ... Congress simply cannot do its job absent an ability to delegate its power under broad general directives.'" *Freedom to Travel,* 82 F.3d at 1437 (quoting *Mistretta v. United States,* 488 U.S. 361, 371, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)).

▮ When the executive acts under express Congressional authority, the executive action is "'supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion rests heavily upon any who might attack it.'" *See PIO,* 853 F.2d at 937 (quoting *Dames & Moore v. Regan,* 453 U.S. 654, 668, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981)). "Delegations of Congressional authority are proper '[s]o long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Freedom to Travel,* 82 F.3d at 1437 (citations omitted); *see also Touby v. United States,* 500 U.S. 160, 165, 111 S.Ct. 1752, 114 L.Ed.2d 219 (same). However, "[t]his 'intelligible principle' must not grant the [Secretary] 'unrestrained freedom of choice.'" *Freedom to Travel,* 82 F.3d at 1437 (quoting *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965)).

 "If the authority accorded the executive branch when acting pursuant to a congressional grant of power is great, it is greater still [when the Secretary acts] in the field of foreign affairs." *PIO,* 853 F.2d at 937. "Delegation of foreign affairs authority is given even broader deference than in the domestic arena." *Freedom to Travel,* 82 F.3d at 1438. "[B]ecause of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature, Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than it customarily wields in domestic areas." *Zemel,* 381 U.S. at 17, 85 S.Ct. 1271 (1965).[21]

 "The level of deference is so much greater [in foreign affairs] that a delegation improper domestically may be valid in the foreign area." *Freedom to Travel,* 82 F.3d at 1438. "Matters relating to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Wald,* 468 U.S. at

242, 104 S.Ct. 3026 (quotation omitted). However, "[t]his does not mean that simply because a statute deals with foreign relations, it can grant the Executive totally unrestricted freedom of choice." *Zemel,* 381 U.S. at 17, 85 S.Ct. 1271.

 In this case, Congress has set forth an "intelligible principle" to guide the Secretary's conduct. Moreover, this intelligible principle does not grant the Secretary "unrestrained freedom of choice." *Freedom to Travel,* 82 F.3d at 1437. For these reasons, Plaintiffs have failed to demonstrate a probability of success on the merits of their claim that the AEDPA provides the Secretary with unfettered discretion.

As noted above, the AEDPA authorizes the Secretary to designate an organization as a "foreign terrorist organization" only if: (1) "the organization is a foreign organization;" (2) "the organization engages in terrorist activity"; and (3) "the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1). The AEDPA expressly defines the terms "terrorist activity,"[22] "engages in terrorist activity,"[23] and "national

---

21. For example, the President has authority to institute a peacetime embargo to deal with threats to "the national security, foreign policy or economy of the United States." *See* 50 U.S.C. § 1701, *et seq.; United States v. Arch Trading Co.,* 987 F.2d 1087, 1092 (4th Cir.1993); *see also Freedom To Travel,* 82 F.3d at 1437 (upholding delegation of authority to the President to renew the Cuban embargo if it is "in the national interest of the United States"); *Communist Party,* 367 U.S. at 95–96, 81 S.Ct. 1357 ("Means for effective resistance against foreign incursion . . . may not be denied to the national legislature.").

22. "Terrorist activity" is defined as:

any activity which is unlawful under the laws of the place where it is committed (or which, if committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:
 (I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).
 (II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

(III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.
(IV) An assassination.
(V) The use of any—
 (a) biological agent, chemical agent, or nuclear weapon or device, or
 (b) explosive or firearm (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.
(VI) A threat, attempt, or conspiracy to do any of the foregoing.
8 U.S.C. § 1182(a)(3)(B)(ii).

23. "Engages in terrorist activity" is defined as:

to commit, in an individual capacity or as a member of an organization, an act of terrorist activity or an act which the actor knows, or reasonably should know, affords material support to any individual, organization, or government in conducting a terrorist activity at any time, including any of the following acts:
 (I) The preparation or planning of a terrorist activity.
 (II) The gathering of information on potential targets for terrorist activity.

security."[24] The language of the AEDPA and its definitions provide the Secretary with "intelligible principles" to which she "is directed to conform." *Cf. Zemel*, 381 U.S. at 18, 85 S.Ct. 1271 (upholding challenged delegation provisions which gave the Secretary power to grant and issue passports without providing any standards to guide the Secretary's discretion).

Congress also prevented the Secretary from exercising "unrestrained freedom of choice" by providing for relief from the Secretary's designation. As noted above, the AEDPA sets forth certain circumstances in which the Court of Appeals may set aside the Secretary's designation. *See id.* 8 U.S.C. § 1189(b)(3).[25] The AEDPA also provides that a group may cease to be designated as a foreign terrorist organization if: (1) the Secretary fails to renew the designation after two years; (2) Congress blocks or revokes a designation; or (3) the Secretary revokes the designation based on a finding that changed circumstances or national security warrants such a revocation. *See* 8 U.S.C. § 1189(a). Based on the AEDPA's language and the express limitations placed on the Secretary's

authority, the Secretary does not have unfettered and unreviewable discretion.[26]

Notwithstanding the AEDPA's language and limitations on the Secretary's authority, Plaintiffs argue that the AEDPA unconstitutionally provides the Secretary with unfettered discretion because it defines "national security" to include "foreign relations." In such circumstances, Plaintiffs contend, the Secretary has a "blank check" because her determination on foreign relations is unreviewable.

Plaintiffs' claim is unpersuasive. Plaintiffs concede, as they must, that it is beyond this Court's competence to determine whether a foreign organization's activities threaten the United States' national security or foreign relations. It does not follow, however, that the deference owed the Secretary's determinations with respect to national security and foreign relations results in unfettered discretion for the Secretary. The great deference owed the Executive in matters involving foreign affairs cannot be used as a ground to assert that the Executive has unfettered, unreviewable discretion. Such a finding would eliminate the very deference required.

(III) The providing of any type of material support, including a safe house, transportation, communications, funds, false documentation or identification, weapons, explosives, or training, to any individual the actor knows or has reason to believe has committed or plans to commit a terrorist activity.
(IV) The soliciting of funds or other things of value for terrorist activity or for any terrorist organization.
(V) The solicitation of any individual for membership in a terrorist organization, terrorist government, or to engage in a terrorist activity.
8 U.S.C. § 1182(a)(3)(B)(iii).

**24.** "National security" is defined as "the national defense, foreign relations, or economic interests of the United States." 8 U.S.C. § 1189(c)(2).

**25.** Section 1189(b)(3) provides:
The Court shall hold unlawful and set aside a designation the court finds to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right;
(D) lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under paragraph (2) or

(E) not in accord with the procedures required by law.
8 U.S.C. § 1189(b)(3).

**26.** Although the AEDPA provides for judicial review and requires the Secretary to make a record, it does not allow for an administrative hearing before designating the foreign organization as terrorist. In *Communist Party*, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625, the Supreme Court upheld the designation of an organization as a "Communist-action organization," subjecting the group to regulations, in part, because the Board's finding "must be made after full administrative hearing, subject to judicial review which opens the record for the reviewing court's determination whether the administrative findings as to fact are supported by the preponderance of the evidence." *Id.* 367 U.S. at 86–87, 81 S.Ct. 1357.

The absence of an administrative hearing before designation under the AEDPA does not render the AEDPA unconstitutional. The statute at issue in *Communist Party* involved the designation of *domestic* organizations as Communist-action organizations. In this case, however, the AEDPA only relates to the designation of *foreign* organizations as terrorist. As noted above, "[t]he level of deference is so much greater [in foreign affairs] that a delegation improper domestically may be valid in the foreign area." *Freedom to Travel*, 82 F.3d at 1438.

The Secretary has the ability and, under the AEDPA, the actual authority to designate foreign organizations as terrorist. As noted, the AEDPA provides sufficient safeguards to ensure that the Secretary has designated a foreign organization for valid grounds rather than based on impermissible targeting of politically disfavored groups. The AEDPA specifically provides for judicial review of the Secretary's designation within 30 days. It also provides various procedures for blocking or revoking the Secretary's designation. These provisions serve to check the Secretary's discretion while still maintaining the proper deference to national security and foreign policy.

Finally, Plaintiffs have presented no evidence that the Secretary has arbitrarily designated the PKK or LTTE as terrorist organizations because she disagrees with their political views. Accordingly, the Court cannot conclude that the Secretary has engaged in impermissible viewpoint discrimination because she has only designated 30 foreign organizations as terrorist. For political or other reasons, the Secretary may determine that only certain foreign organizations should be designated as terrorist. That determination falls well within the Secretary's expertise and authority. Neither Plaintiffs nor this Court has the ability to determine which entities are a threat to national security. That decision is exclusively entrusted to the Secretary and is "largely immune from judicial inquiry or interference." *Regan,* 468 U.S. at 242, 104 S.Ct. 3026. If the Plaintiffs disagree with a particular designation, they may challenge the designation through the applicable procedures.

For all these reasons, the Court concludes that Plaintiffs have not established a probability of success on the merits of their claim that the Secretary has unfettered discretion to target disfavored political groups.

## VI. Plaintiffs' Argument that the AEDPA is Impermissible Vague in Violation of the First and Fifth Amendments

Plaintiffs claim that the AEDPA is impermissibly vague and violates both the First and Fifth Amendments. Plaintiffs base their vagueness challenge on two grounds: (1) the AEDPA provides the Secretary with unfettered, unreviewable discretion to decide which organizations are designated as for-

eign terrorist organizations; and (2) the AEDPA'S specific terms are not sufficiently clear. *See Freedom to Travel,* 82 F.3d at 1440 n. 11 (noting that a statute may be "void for vagueness" on two grounds: (1) the failure to define the prohibited conduct so that an ordinary person would know what is required; and (2) encouraging arbitrary and discriminatory enforcement).

A challenge to a statute based on vagueness grounds requires the court to consider whether the statute is sufficiently clear so as not to cause persons " 'of common intelligence . . . necessarily [to] guess at its meaning and [to] differ as to its application.' " *United States v. Wunsch,* 84 F.3d 1110, 1119 (9th Cir.1996) (quoting *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)).

Vague statutes are void for three reasons: "(1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Foti v. City of Menlo Park,* 1998 WL 211733 at *6 (9th Cir. May 1, 1998) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)).

"A statute is void for vagueness when it does not sufficiently identify the conduct that is prohibited." *United States v. Makowski,* 120 F.3d 1078, 1081 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 610, 139 L.Ed.2d 497 (1997); *see also Kev, Inc. v. Kitsap County,* 793 F.2d 1053, 1057 (9th Cir.1986) ("A fundamental requirement of due process is that a statute must clearly delineate the conduct it proscribes.") (citing *Grayned,* 408 U.S. at 108, 92 S.Ct. 2294). "A statute must be sufficiently clear so as to allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.' " *Foti,* 146 F.3d at 638 (quoting *Grayned,* 408 U.S. at 108, 92 S.Ct. 2294).

"[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally pro-

tected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). "[W]hen First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required." *Foti,* 146 F.3d at 638.

■ "[D]ue process does not require 'impossible standards' of clarity." *Kolender v. Lawson,* 461 U.S. 352, 361, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (quoting *United States v. Petrillo,* 332 U.S. 1, 7–8, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947)). "[W]e can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. 2294. Nevertheless, "[t]he requirement of clarity is enhanced when criminal sanctions are at issue or when the statute abuts upon sensitive areas of basic First Amendment freedoms." *Information Providers' Coalition for the Defense of the First Amendment v. FCC,* 928 F.2d 866, 874 (9th Cir.1991) (quotation omitted); *see also Kolender,* 461 U.S. at 357, 103 S.Ct. 1855 (stating that statutes imposing criminal penalties are void for vagueness if they fail to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement"); *United States v. Robel,* 389 U.S. 258, 275, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) ("The areas of permissible indefiniteness narrows ... when the regulation invokes criminal sanctions and potentially affects fundamental rights.") (Brennan, J., concurring). Thus, under the Due Process Clause, a criminal statute is void for vagueness if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss,* 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

## A. Arbitrary and Discriminatory Enforcement

■ Plaintiffs argue that the AEDPA is unconstitutionally vague because it provides the Secretary with unfettered discretion to decide which organizations are designated as foreign terrorist organizations. Because the Secretary determines the United States' foreign relations and national security, Plaintiffs contend that the Secretary's designation authority is unreviewable. Thus, Plaintiffs argue that the AEDPA allows the Secretary to single out entities for designation as foreign terrorist organizations based on arbitrary and discriminatory grounds.

Plaintiffs' argument with respect to vagueness is essentially the same as their argument with respect to unfettered discretion. As previously noted, however, neither Plaintiffs nor this Court has the ability to determine which entities are a threat to national security or what the United States' foreign policy should be. Those decisions are exclusively entrusted to the Secretary and are "largely immune from judicial inquiry or interference." *Regan,* 468 U.S. at 242, 104 S.Ct. 3026. Thus, for the reasons stated above, the Court concludes that Plaintiffs have not established a probability of success on the merits of their claim.

Plaintiffs' reliance on *Massieu v. Reno,* 915 F.Supp. 681, 698–703 (D.N.J.), *rev'd on other grounds,* 91 F.3d 416 (3d Cir.1996), to support their claim does not alter the Court's analysis. In *Massieu,* the court addressed the constitutionality of a statute which gave the Secretary the discretion to deport any alien lawfully within the United States, solely because the individual's presence in the United States would, in some unexplained way, impact the United States' foreign policy interests. *Id.* at 686.[27] The district court found the statute void for vagueness. *Id.* at 703. The court recognized that "neither the legislature nor the judiciary possesses the institutional competence to question the Secretary of State's decisions on matters of foreign policy." *Id.* at 701. Nevertheless, the Court stated that " '[f]oreign policy' cannot serve as the talisman behind which Congress may abdicate its responsibility to pass only sufficiently clear and definite laws when those laws may be enforced against the indi-

---

**27.** The relevant statute provided: "An alien whose presence or activities in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1251(a)(4)(C)(i).

vidual." *Id.* at 702 (citing *Shahla v. INS,* 749 F.2d 561, 563 n. 2 (9th Cir.1984)).

Plaintiffs' reliance on *Massieu* is unavailing. The statute at issue in *Massieu* provided the Secretary with complete discretion to order an alien's deportability when the Secretary deemed it necessary to serve the United States' foreign policy interests. In such circumstances, aliens had no way of knowing when the Secretary would deem their presence to have "potentially serious adverse foreign policy consequences" requiring their deportation. *Id.* at 699–700. In the instant case, however, the Secretary has identified thirty foreign organizations which she has designated as terrorist. Thus, Plaintiffs know that providing "material support" to one of these entities is a crime.

Moreover, the action in *Massieu*—deportation—resulted from the Secretary's independent decision, rather than any particular conduct by an alien. In the instant case, however, the action—criminal sanctions—results from the Plaintiffs' own activities rather than from any unfettered discretion exercised by the Secretary.

Because the Court has already rejected this claim and because Plaintiffs' reliance on *Massieu* is unpersuasive, the Court finds that Plaintiffs are not entitled to a preliminary injunction based on their claim that the AEDPA allows for discriminatory and arbitrary enforcement.

**B. Defining the Prohibited Conduct**

 Plaintiffs also advance their vagueness challenge on the grounds that the AEDPA is impermissibly vague because it fails to provide adequate notice as to what consti-

tutes "material support or resources."[28] Specifically, Plaintiffs assert that the prohibitions on "personnel" and "training" are unclear. The Court agrees.

The determinative issue with respect to Plaintiffs' void for vagueness challenge is whether the AEDPA sufficiently identifies the prohibited conduct. *See Makowski,* 120 F.3d at 1081. Moreover, because the AEDPA provides for criminal sanctions for those who provide material support to foreign terrorist organizations, *see* 18 U.S.C. § 2339B(a), "[t]he requirement of clarity is enhanced." *Information Providers' Coalition,* 928 F.2d at 874. In this case, the terms "personnel" and "training" are not "sufficiently clear so as to allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Foti,* 146 F.3d at 638 (quoting *Grayned,* 408 U.S. at 108, 92 S.Ct. 2294).[29]

Defendants contend that the term "personnel" is "aimed at denying human resources, as that term is commonly understood, *i.e.,* the provision of human resources to proscribed terrorist organizations." Opposition at 28. Defendants contend that the AEDPA prohibits the act of donation, including sending "personnel to PKK or LTTE headquarters to work under their direction." Opposition at 28. Defendants fail, however, to point to any language in the AEDPA which limits the prohibition on "personnel" to people working at the headquarters and at the direction of foreign terrorist organizations.

HLP and Judge Fertig have advocated for the PKK before the UN Commission on Human Rights, petitioned members of Con-

---

**28.** The AEDPA defines the term "material support or resources" as "currency or other financial securities, financial services, lodging, *training,* safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, *personnel,* transportation, and other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A(b) (emphases added).

**29.** Other cases support the finding that the terms "training" and "personnel," similar to language held impermissibly vague in other cases, does not allow a person of ordinary intelligence to know what conduct is prohibited. *See, e.g., Kolender,* 461 U.S. at 357, 103 S.Ct. 1855 (sustaining facial challenge to ordinance requiring loiter-

ers to provide police with "credible and reliable" identification); *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (finding statute barring "treat[ing] contemptuously the flag of the United States" "void for vagueness"); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1983) (invalidating vagrancy ordinance which permitted police to arrest a person for being a "common thief"); *Shuttlesworth v. City of Birmingham,* 382 U.S. 87, 95, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965) (invalidating statute permitting police to arrest loiterer for not obeying officer's request to "move on"); *Lanzetta v. New Jersey,* 306 U.S. 451, 458, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (invalidating statute which made it illegal to be a "gangster").

gress, and advocated for the freedom of four Turkish political prisoners convicted of being PKK members or supporters. Additionally, HLP and Judge Fertig would like to but are afraid to write and distribute publications supportive of the PKK and work with PKK members at peace conferences and other meetings toward the cause of peace and justice for the Kurds. Further, Plaintiff WTCC has distributed LTTE literature and informational materials throughout the United States to advocate on behalf of the Sri Lankan Tamils' human rights.

Each of these activities could be construed as the prohibited provision of "personnel" under the AEDPA. The AEDPA places no limitation on the type of personnel which is prohibited, or whether the use of any human resources in support of a foreign terrorist organization is prohibited. Thus, the term "personnel" broadly encompasses the type of human resources which Plaintiffs seek to provide, including the distribution of LTTE literature and informational materials and working directly with PKK members at peace conferences and other meetings.

Defendants also contend that the term "training" "is easily understood to forbid the impartation of skills to foreign terrorist organizations through training." "This would include training foreign terrorists, for instance, on how to use weapons, build bombs, or raise funds." Opposition at 28–29. Again, Defendants cannot point to any provision within the AEDPA which supports their limitation of the proscribed "training."

In this case, HLP and Judge Fertig have assisted and trained some PKK members in using humanitarian law and international human rights law and in seeking a peaceful resolution of the conflict in Turkey. HLP and Judge Fertig would also like to train the PKK in how to engage in political advocacy and on how to use international law to seek redress for human rights violations.

The AEDPA broadly prohibits all "training" without express limitation. *See* 18 U.S.C. § 2339A(b). It does not prohibit only

training on how to use weapons, build bombs, or raise funds. Thus, the AEDPA criminalizes some of the activities which Plaintiffs have engaged in and would like to engage in.

Finally, Defendants contend that any vagueness contained in the AEDPA is mitigated because it contains a scienter requirement. *See* 18 U.S.C. § 2339B(a)(1) ("whoever ... *knowingly* provides material support ...") (emphasis added). This claim is without merit.

The Supreme Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *See Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. 1186. In this case, however, the scienter requirement does not mitigate a finding of vagueness. It is undisputed that the Plaintiffs have and seek to continue to "knowingly" provide training and personnel. The AEDPA does not, however, appear to allow persons of ordinary intelligence to determine what type of training or provision of personnel is prohibited. *See Foti,* 146 F.3d at 638. Rather, the AEDPA appears to prohibit activity protected by the First Amendment—distributing literature and information and training others to engage in advocacy. Thus, the AEDPA's scienter requirement does not mitigate a finding of vagueness.

For all these reasons, Plaintiffs have demonstrated a probability of success on the merits of their claim that the terms "training" and "personnel" are impermissibly vague.[30]

## VII. Conclusion

For all these reasons, the Court DENIES in part, and GRANTS in part, Plaintiff's Motion for a Preliminary Injunction. The Court DENIES the preliminary injunction on all grounds other than with respect to Plaintiffs' claim that the use of the terms "personnel" and "training" in 18

---

**30.** Because Plaintiffs have demonstrated a probability of success on their claim that the terms "personnel" and "training" are vague, they have necessarily established irreparable injury. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see Jacobsen v. United States Postal Serv.,* 812 F.2d 1151, 1154 (9th Cir.1987). Accordingly, Plaintiffs are entitled to a preliminary injunction.

U.S.C. § 2339A(b) is impermissibly vague. The Court finds that the Plaintiffs are likely to succeed on this claim, and therefore, consistent with the AEDPA's severability clause, the Court severs these two terms from the statute.[31]

**SO ORDERED.**

---

**31.** The parties agree that the terms "training" and "personnel" are severable under the AEDPA. The parties dispute, however, the scope of the injunction. Plaintiffs contend that the Court should issue a nationwide injunction because the Attorney General has authority over nationwide enforcement of the statute.

"A preliminary injunction should be narrowly tailored to remedy the specific harm alleged." *United States v. BNS Inc.*, 858 F.2d 456, 464 (9th Cir.1988). An injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). In general, injunctive relief should be limited to apply only to named plaintiffs where there is no class certification. *See Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727–28 & n. 1 (9th Cir.1983). Nevertheless, "an injunction is not necessarily made overbroad by extending benefit or protection to persons other than pre-

vailing parties in the lawsuit-even if it is not a class action-*if such breadth is necessary to give prevailing parties the relief to which they are entitled.*" *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir.1987); *see also Zepeda*, 753 F.2d at 729 n. 1 ("[A]n injunction benefitting nonparties is permissible if such breadth is necessary to give prevailing parties the relief to which they [individually] are entitled.") (quotation omitted).

The four organizational Plaintiffs have members across the country. Further, the AEDPA is an act of Congress which has national implications. Nevertheless, the Court declines to grant a nationwide injunction. In this case, the Court can adequately shape relief by tailoring it to the named Plaintiffs. Accordingly, the Court's injunction will preclude the Attorney General from enforcing the AEDPA against any of the named Plaintiffs or their members based on the aforementioned activities which are encompassed by the terms "training" or "personnel."